# EXHIBIT 3

Firm ID No. 90443

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| ALBERTO-CULVER USA, INC., | ) | 2009L009543 |
| | ) | CALENDAR/ROOM W |
| Plaintiff, | ) | TIME 00:00 |
| v. | ) Case No.: | Breach of Contract |
| | ) | |
| THE PROCTER & GAMBLE COMPANY | ) Judge | |
| and NOXELL CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiff Alberto-Culver USA, Inc. ("Alberto-Culver"), as its Verified Complaint against The Procter & Gamble Company ("P&G") and Noxell Corporation ("Noxell") (collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1. This case arises from Defendants' breach of contract in the sale of its Noxzema brand and associated products ("Noxzema") to Alberto-Culver on October 1, 2008. Defendants executed an Asset Sale and Purchase Agreement ("Agreement") and a Transitional Supply Agreement ("TS Agreement") with Alberto-Culver.[1] Under the Agreement, Alberto-Culver paid $81 million for the Noxzema brand. Under the TS Agreement, Defendants have temporarily manufactured Noxzema products for Alberto-Culver to provide for a smooth transfer of the manufacturing process for the time period during which Alberto-Culver developed its own manufacturing capabilities. The Agreement required Defendants to cooperate with Alberto-

---

[1] In this Complaint, capitalized terms not otherwise defined are given the meaning set forth in the Agreement or TS Agreement.

Culver using commercially reasonable efforts in the transition of the business so that, among other things, there would be an uninterrupted supply of products to customers.

2. During the sale transaction, Defendants breached representations, warranties and agreements. As a result, Alberto-Culver overpaid for Noxzema, suffered a delay in rolling out its strategic plans with respect to the brand, and incurred significant costs addressing defects in the Noxzema products Defendants manufactured for Alberto-Culver.

3. Noxzema is a household name in North America. Upon information and belief, it is currently the fifth or sixth most successful facial-cleansing brand in North America. Although the Noxzema brand consists of a full line of skin-care products, Noxzema is best known for the product that started it all: Noxzema Original Deep Cleansing Cream ("Original Noxzema"). Original Noxzema has been produced for nearly a century, and it is trusted by millions of consumers in the United States and Canada.

4. Upon information and belief, Defendant Noxell is the company that made Noxzema prior to its acquisition by P&G in 1989.

5. Defendant P&G is one of the world's largest companies. In its fiscal year ended June 30, 2008, P&G had over $83 billion in net sales. It produces many of the world's top brands in household and personal care products. Noxzema was one of those brands, until Defendants sold it to Alberto-Culver on October 1, 2008.

6. Alberto-Culver produces household and personal-care products, but it is only a small fraction of the size of P&G by almost any measure (*e.g.*, sales, assets, employees, brands). Alberto-Culver has been successful in part because of a strong portfolio of a handful of well-known and high-performing beauty brands. Alberto-Culver viewed Noxzema as a safe addition to that portfolio.

7. In March 2009, after the acquisition, Alberto-Culver became aware of greater than usual customer complaints regarding Noxzema products. Upon investigation, Alberto-Culver determined that there was a significant and material defect rate of between 15% and 20% for the Original Noxzema products manufactured by Defendants under the TS Agreement. Alberto-Culver also determined that the root cause of the defect was most likely the result of multiple violations of the product Specifications, including heating too long during the manufacturing process at P&G's plant at Cayey, Puerto Rico.

8. Alberto-Culver has taken steps to address the product defect issues, such as, among other things, inspecting all products prior to shipment, conducting a nationwide audit of products, testing to determine the root cause of the defects, and requesting that Defendants correct the manufacturing defects.

9. As a result of these efforts, Alberto-Culver has incurred significant costs. Alberto-Culver has made demands to Defendants to honor their obligations under the Agreement and TS Agreement to pay these costs and to indemnify Alberto-Culver for its losses. Defendants have refused to accept any responsibility.

10. Alberto-Culver has filed this action to recover its damages caused by Defendants' breaches of contracts.

## PARTIES, JURISDICTION, AND VENUE

11. Alberto-Culver is a Delaware corporation with its principal place of business in Melrose Park, Cook County, Illinois.

12. P&G is an Ohio company with its principal place of business in Cincinnati, Hamilton County, Ohio.

13. Upon information and belief, Noxell, d/b/a Procter & Gamble Cosmetics, is a Maryland company with its principal place of business in Hunt Valley, Baltimore County, Maryland. P&G owns Noxell.

14. Personal jurisdiction over P&G and Noxell exists because they transact substantial business in Illinois. Additionally, P&G and Noxell breached contractual duties owed to Alberto-Culver in Illinois.

15. Venue is proper in this judicial circuit because some or part of the transaction that gives rise to these claims occurred in this county, and because one of the Defendants is a resident of Cook County, as "resident" is defined for venue purposes under 735 ILCS 5/2-101, or all Defendants are nonresidents of Illinois.

## BACKGROUND

16. The Noxzema brand originated nearly a century ago with a single product, a white cream meant to soothe sunburns. That original product is still sold today, in its iconic cobalt-blue jars, as Noxzema Original Deep Cleansing Cream. Generations of consumers in North America and throughout the world have trusted Original Noxzema to safely cleanse, rejuvenate, and energize their skin.

17. Original Noxzema is distinctive: if properly manufactured, it is a thick, white, smooth, non-greasy cream, homogenous in consistency, with a density and firmness that provides a soft and well-known "crunch" as it is scooped from its jar. The top of the cream in a new jar has a smooth, shiny appearance with concentric rings created during the filling of the jar.

18. Upon information and belief, P&G acquired Noxell, including Noxell's Noxzema brand products, in 1989. For the past several years, however, P&G focused on other skin-care product brands, shifting resources and attention away from Noxzema products. For example, in 2007, Defendants reduced or suspended marketing support for the Noxzema brand products,

4

reduced the development of new products, and reduced brand-management resources. As a result, sales of the Noxzema brand products declined. Ultimately, Defendants determined that Noxzema did not fit their global strategy and sought to sell the Noxzema brand.

A. The Asset Sale and Purchase Agreement

19. In early 2008, Alberto-Culver indicated to Defendants its interest in bidding on the Noxzema brand products, which at the time included three product lines: (1) Base/Original, which includes the Original Noxzema products; (2) Triple Clean; and (3) Continuous Clean. These product lines are produced in several product forms, including the jars of Original Noxzema (with the unique Noxzema "crunch") that are at issue in this lawsuit.

20. As part of the bid process, Defendants and Alberto-Culver representatives met at P&G's headquarters in Cincinnati, Ohio on or about April 10, 2008 for a "Management Presentation." In that presentation, Defendants repeatedly touted the "extremely strong consumer loyalty" to Noxzema products, its highly profitable brand, and "very attractive growth opportunities" into new geographies globally, especially in developing economies. Defendants emphasized that Noxzema was still a top facial-cleansing brand in which "strong consumer loyalty and robust brand fundamentals have been the cornerstone of [its] resilience." Defendants identified as some of Noxzema's key brand strengths its "outstanding product performance" and "Extremely Loyal Consumer Base." Among the key reasons Noxzema products are so popular with consumers, according to Defendants, is the "unique experience"— described as a "refreshing feeling" during the consumer's use of Noxzema.

21. Following the Management Presentation, Alberto-Culver engaged in more than five months of due diligence into Defendants' Noxzema brand products. On September 5, 2008, the parties entered into the Agreement. In the Agreement, among other things, Alberto-Culver agreed to purchase the rights to all of Noxzema, including Original Noxzema, from Defendants

5

for $81 million. The transaction was to be consummated with a Bill of Sale and Assignment, among other documents, at Closing.

22. In section 9.01 of the Agreement, Defendants agreed to "jointly and severally, defend, indemnify and hold Buyer and its officers, directors, employees, Affiliates and/or agents ... harmless from and against all claims, losses, liabilities, damages, costs and expenses (including without limitation reasonable fees and expenses of attorneys incurred in investigation or defense of any Action) whether or not involving a third party Action (collectively "Losses"), arising out of or related to . . . (ii) any breach of a representation, warranty, covenant or agreement of Sellers in this Agreement or the other Transaction Documents . . . ."

B. The Transitional Supply Agreement

23. As part of the Closing, on October 1, 2008, the parties entered into the TS Agreement. The purpose of the TS Agreement was to require Defendants to continue to manufacture or cause to be manufactured all Noxzema products for Alberto-Culver until Alberto-Culver developed its own product-manufacturing source or sources. Included in the products that Defendants agreed to manufacture and supply pursuant to the TS Agreement are the Original Noxzema products in the 2.5-ounce, 10.75-ounce, and 14-ounce jars, all of which were manufactured at P&G's Cayey, Puerto Rico facility.

24. For the first 90 days of the TS Agreement, Defendants agreed to sell to Alberto-Culver, and Alberto-Culver agreed to purchase, its product requirements up to a specified maximum. Thereafter, Defendants agreed to sell the amount of products ordered by Alberto-Culver. TS Agreement § 2.02.

6

1. **Basic Obligations**

25. In fulfilling its obligations under the TS Agreement, Defendants agreed not to "use any defective, obsolete or damaged inventory, raw materials, packaging materials or other materials to satisfy [Alberto-Culver's] orders." *Id.* § 5.02.

2. **Quality Assurance**

26. Defendants also agreed to "perform or cause to be performed quality control tests and assays on raw and packaging materials and Products in accordance with Specifications, including but not limited to Products shipped under quarantine." *Id.* § 7.01. The parties defined "Specifications" as the "procedures, requirements, formula(e) and standards related to Products employed by or on behalf of Sellers as of the Closing Date . . . ." *Id.* § 1.08.

27. In addition, in sections 7.02 and 7.03 of the TS Agreement, the parties agreed to a procedure for Alberto-Culver to inspect and test product manufactured by Defendants for quality assurance purposes. Under those procedures, if Alberto-Culver determines that any Product does not conform to the Specifications, and provides notice to Defendants, Defendants "shall promptly take steps to confirm [Alberto-Culver's] determination, correct the problem, if any, trace the defective Products, if any, and if reasonably required by [Alberto-Culver], recall or withdraw the Products found to be involved." *Id.* § 7.03. The parties further agreed that such "withdrawal or recall shall be at Sellers' cost and expense, if Sellers failed to conform with the Specifications or otherwise breached any Product warranty or term contained herein . . . except to the extent the same is attributable to the negligence of [Alberto-Culver] or any breach by [Alberto-Culver] of the terms hereof." *Id.* The parties specifically agreed that: "If Sellers failed to conform with the Specifications or otherwise breached any Product warranty contained herein, Sellers shall be responsible for the entire costs of replacement Product, including, but not limited

7

to the cost of the components for the replacement Product, as well as the costs related to the disposal of the recalled Product ("Recall/Withdrawal Costs")." *Id.*

### 3. Express Warranties

28. Defendants expressly warranted that "the Products will be in material compliance with Specifications at the time such Products are delivered to the common carrier for shipment to [Alberto-Culver] and at least of the same quality and workmanship as such products sold by Sellers during the 12-month period immediately preceding the date hereof." *Id.* § 11.02.

29. Defendants also expressly warranted that "the Products will be merchantable and fit for the purposes for which such Products have been sold prior to Closing." *Id.* § 11.03.

### 4. Indemnification

30. Finally, Defendants agreed to indemnify Alberto-Culver: "Subject to Section 12.03 and notwithstanding any knowledge of, or investigation by, [Alberto-Culver] or its employees, officers, directors, Affiliates and/or agents, whether before or after the date of this TS Agreement, or the Effective Time, Sellers will, jointly and severally, defend, indemnify and hold [Alberto-Culver] and its officers, directors, employees, Affiliates and/or agents harmless from and against any Demand to the extent such Demand arises out of or relates to breach of this TS Agreement by Sellers." *Id.* § 12.02. The parties defined "Demand" to include "all claims, losses, liabilities, damages, costs and expenses (including without limitation reasonable fees and expenses of attorneys incurred in investigation or defense of any Action) whether or not involving a third party Action...." *Id.* § 12.01.

### C. Manufacturing Defects in Defendants' Production of Original Noxzema.

31. Both before the Agreement and TS Agreement and since, Defendants have produced Original Noxzema at P&G's manufacturing facilities in Cayey, Puerto Rico. Since the acquisition, Alberto-Culver has shipped product from Cayey to Alberto-Culver's distribution

8

facilities in Atlanta, Georgia. Alberto-Culver uses the same shipping company and the same shipping process Defendants used before the sale to transport the finished product from Puerto Rico to the continental United States.

32. In January 2009, Alberto-Culver received nine complaints related to the 2.5-ounce, 10.75-ounce, and 14-ounce jars of Original Noxzema. In February 2009, Alberto-Culver received 17 complaints. In March 2009, the complaints escalated to 61 for the month.

33. Upon recognizing the increase in consumer complaints, Alberto-Culver immediately began an investigation.

34. *First*, on or about March 11, 2009, Alberto-Culver contacted Defendants about the product issues, and on or about March 17, 2009, requested information related to Defendants' production of the Original Noxzema products at P&G's Cayey plant, and requested product samples.

35. *Second*, on or about April 1, 2009, Alberto-Culver initiated a 100% inspection of all Original Noxzema products within its distribution centers. As a result of this inspection, Alberto-Culver discovered that approximately 20% of the products were defective. The defects were visually obvious. Instead of the distinctive, consistent texture Original Noxzema is known for, the defective products display unappealing characteristics: standing liquid with clumps of cream similar to cottage cheese, grains or shards throughout, and/or a dull and cracked surface. The defective products lack Original Noxzema's familiar smooth, shiny top with concentric rings and its typical "crunch" feeling.

36. *Third*, on or about April 3, 2009, Alberto-Culver contracted with Retail Quality Assurance ("RQA"), a consulting and auditing firm, to conduct a limited quality audit. From this limited sampling, approximately 20% of the product sampled was defective. Based on those

initial test results, on or about April 15, 2009, Alberto-Culver contracted with RQA to perform additional audits, which reflected a defect rate of approximately 17%. Thus, on or about April 24, 2009, Alberto-Culver authorized RQA to conduct an expanded nationwide audit.

37. *Fourth*, on or about April 6, 2009, Alberto-Culver contracted with Microtrace LLC, an independent laboratory, to test samples of both good and defective product in an effort to identify the root cause of the product defects. The results of that testing demonstrated that the defective products have high quantities of free, unsaturated fatty acids, which can be produced in various ways during manufacturing, including through excessive heating. This sensitivity to excessive heating is consistent with Defendants' process instructions, which provide for "controlled" heating of no more than two hours during production. Importantly, the batch records provided by Defendants show numerous production times in excess of the two hours prescribed by their own specifications.

38. *Fifth*, in a further effort to identify the root cause of the manufacturing defects, Alberto-Culver conducted a statistical analysis of RQA's audit to determined the historical defect rates of the Original Noxzema, which would help to identify the timing of the problems. The statistical analysis revealed that Defendants' excessive defect rates were not a new phenomenon. Indeed, the statistical analysis of the audits performed by RQA revealed that lots manufactured in 2007 and 2008 had defect rates between 5% and 25%. At no point during the due diligence or at any other point prior to the sale did Defendants disclose these significant defect rates in the manufacture of the Original Noxzema products. Indeed, when asked about consumer complaints during due diligence, Defendants stated they had no consistent consumer complaints.

39. *Sixth*, on or about April 23, 2009, Alberto-Culver conducted a meeting with Defendants at the Cayey facility in Puerto Rico to discuss the manufacturing process at the

10

facility. During that meeting, Defendants' manufacturing team admitted that they had not been conducting the "crunch" test of finished products before shipping them to Alberto-Culver, which is inconsistent with the specifications for production Defendants have historically applied to finished product. Despite repeated requests for the rationale for eliminating these finished product inspections, none has been provided. This lack of adequate validation is not in compliance with current good manufacturing practices and therefore a breach of section 8.01 of the TS Agreement. In addition, the Cayey visit, together with the other information provided by Defendants, confirms that there was a wide variability and inconsistency between production runs, including excessive batch-time heating, indicating that Defendants were not manufacturing the product pursuant to Specifications.

40. Alberto-Culver has expended considerable resources to determine the root cause of the defects and take other measures to address the product-defect issue.

D. Alberto-Culver's Notices to Defendants

41. On or about April 10, 2009, Alberto-Culver provided Defendants with its "Notice of Contractual Claims, Including Claims for Indemnification." In the April 10 Notice, Alberto-Culver notified Defendants of the product defects, that Alberto-Culver was conducting additional tests, and that Defendants would be responsible for, among other things, the entire cost of Alberto-Culver's efforts to address the product defect issues. Alberto-Culver also requested additional information and product samples and that Defendants permit Alberto-Culver to visit the factory to investigate the manufacturing defects.

42. Over the next six weeks, Alberto-Culver provided additional, supplemental notice letters dated April 15, 2009, April 21, 2009, April 22, 2009, April 24, 2009, April 29, 2009, and May 21, 2009 that, among other things, identified further developments in its investigation and apprised Defendants of Alberto-Culver's proposed next steps. In those letters, Alberto-Culver

11

requested that Defendants provide "any information that can assist us in mitigating the damages caused by Sellers' supply of defective product," and to advise Alberto-Culver if Defendants "have a suggestion or proposal for another method" other than what Alberto-Culver planned to do, "that will minimize the damage to our brand equity and our sales/profits."

43. In its Notice letters, Alberto-Culver also identified Defendants' contractual obligations to correct all problems related to the supply of non-conforming products or otherwise supplied products that breached representations, warranties, and certifications in the Agreement and/or TS Agreement. Alberto-Culver also identified the efforts it had taken to address the defect issues, including but not limited to, the testing of product samples, quality audits, and product inspection, and demanded that Defendants reimburse Alberto-Culver for the costs of those efforts as required under the Agreement and/or TS Agreement.

44. Defendants have either not responded or responded slowly to Alberto-Culver's requests and failed to fulfill their contractual obligations to Alberto-Culver. For example, despite Alberto-Culver's repeated requests, Defendants have failed to provide information to validate adequately their decision to eliminate the "crunch" test for Original Noxzema at the Cayey plant or provide an explanation of how Defendants confirmed the product quality of Original Noxzema in the absence of the "crunch" test or any visual test. Defendants have failed to provide the requested assurances that Defendants have maintained the equipment and facilities at the Cayey plant as required by section 4.02 of the TS Agreement. Defendants have also failed to acknowledge that they are responsible for reimbursing Alberto-Culver for the millions of dollars Alberto-Culver has expended to address the product defect issues.

12

## COUNT I
### Breach of Contract— Product Defects

45. Alberto-Culver incorporates and realleges Paragraphs 1-44 as if fully set forth herein.

46. The Agreement and TS Agreement are valid and enforceable contracts, consisting of an offer, acceptance, consideration, and definite and certain terms.

47. Alberto-Culver has fully performed every obligation it owes to Defendants under the Agreement and TS Agreement and in accordance with Alberto-Culver's Uniform Commercial Code rights.

48. Defendants' excessive manufacturing defect rates during the period between July 1, 2007 and October 1, 2008 violated at least the following provisions of the Agreement:

   (a) Section 4.08(a) in which Defendants represented and warranted that "from July 1, 2007 until the date of this Agreement, Sellers and their respective Affiliates have conducted the Business in the ordinary course of business consistent with past practice during the immediately preceding twelve-month period and there has not been: (a) any Material Adverse Effect."

   (b) Section 4.08(c) in which Defendants represented and warranted that from July 1, 2007 until September 5, 2008 there had not been "any damage, destruction or loss adversely affecting the Business or the Acquired Assets in any material respect (whether or not covered by insurance)."

   (c) Section 4.09(e) in which Defendants represented and warranted that the inventory subject to the Agreement "has been acquired or produced in the ordinary course of business and is of a quality and quantity that is usable or saleable in the ordinary course of business."

   (d) The implied duty of good faith and fair dealing.

49. The supply of defective products and Defendants' failure to follow its own manufacturing processes during the period subsequent to October 1, 2008 violated at least the following provisions of the TS Agreement:

   (a) Section 7.01 in which Defendants agreed to "perform or cause to be performed quality control tests and assays on raw and packaging materials and Products in

13

accordance with Specifications, including but not limited to Products shipped under quarantine."

(b) Section 7.03 in which Defendants agreed that if Alberto-Culver finds that (based on testing or reports) "any Product is adulterated or not in conformity with the agreed Specifications" and Alberto provides notice to Defendants in accordance with section 7.03, Defendants are required to "promptly take steps to confirm Buyer's determination, correct the problem, if any, trace the defective Products, if any, and if reasonably required by Buyer, recall or withdraw the Products found to be involved."

(c) Section 11.02 in which Defendants expressly warranted that "the Products will be in material compliance with Specifications at the time such Products are delivered to the common carrier for shipment to Buyer and at least of the same quality and workmanship as such Products sold by Sellers during the 12-month period immediately preceding" October 1, 2008.

(d) Section 11.03 in which Defendants expressly warranted that "the Products will be merchantable and fit for the purposes for which such Products have been sold prior to Closing."

(e) The implied duty of good faith and fair dealing.

50. As a result of Defendants' breaches of these provisions of the Agreement and TS Agreement, Alberto-Culver has suffered losses, including but not limited to, overpaying for the Noxzema brand and business, incurring the costs associated with testing product samples, quality audits, product inspection, and attorneys' fees. Accordingly, Alberto-Culver is entitled to reimbursement under section 7.03 of the TS Agreement and indemnification from Defendants under Article 9 of the Agreement and Article 12 of the TS Agreement.

WHEREFORE, Plaintiff Alberto-Culver prays for the following relief:

A. A declaration that Defendants have breached the Agreement and TS Agreement and Alberto-Culver is entitled to damages;

B. the Court award Alberto-Culver damages for Defendants' breaches of the Agreement and TS Agreement;

C. the Court award Alberto-Culver its attorneys' fees and costs herein; and

14

D.  the Court award all such further relief as may be appropriate, ~~including damages~~ in excess of $30,000.00.

Dated: August 12, 2009

*[signature]*

Brian D. Sieve, P.C.
Terrence J. Dee, P.C.
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
brian.sieve@kirkland.com
terrence.dee@kirkland.com

*Counsel for Plaintiff*
*Alberto-Culver USA, Inc.*

## Verification

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he believes the same to be true.

Dated: August 12, 2009

Respectfully submitted,

ALBERTO-CULVER USA, INC.

By: _____
Name: Gina Lazaro
Title: Vice President, Global Skin Care